## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

_____

PAMELA YAZZIE,

        Plaintiff,

v.                                        No. CIV 02-1482 BB/ACT

NEW MEXICO CORRECTIONS
DEPARTMENT and ARAMARK
CORRECTIONAL SERVICES, INC.,

        Defendants.

### MEMORANDUM OPINION AND ORDER

This matter comes before the Court on motions for summary judgment filed by each Defendant (Docs. 42, 45). The Court has considered the submissions and arguments of the parties, as well as the applicable law. Having done so, the Court will DENY both motions for summary judgment, for the reasons stated below.

**Summary of Case**

Plaintiff was employed by Defendant Aramark Correctional Services ("Aramark") as a food-service employee. Aramark had a contract with Defendant Corrections Department ("Department") to prepare and serve meals at the Department's Western New Mexico Correctional Facility ("prison") in Grants, New Mexico. Plaintiff worked alongside inmate employees who assisted in duties such as cleaning the dining areas. While Plaintiff was on duty, she was physically assaulted by one of these inmate employees ("Bryant"). Plaintiff suffered injuries, received workers' compensation benefits for a period of time, and never went back to work for Aramark. Subsequently, Plaintiff filed this lawsuit, seeking damages under state tort law from Aramark and the Department. Plaintiff also seeks damages from Aramark for alleged violations of Title VII, 42 U.S.C. §§ 2000e *et seq.*, which

violations assertedly resulted in a constructive discharge.  Both Defendants maintain they are entitled to protection from the tort claims under New Mexico law, arguing that Plaintiff's exclusive remedy against each Defendant was provided by the workers' compensation statute rather than a lawsuit in tort.  Each Defendant filed a motion for summary judgment requesting dismissal of Plaintiff's claims. Aramark in addition seeks summary judgment on the Title VII claim.

### Standard of Review

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  When applying this standard, a court must "view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party."  *Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Serv.*, 165 F.3d 1321, 1326 (10th Cir. 1999).  A mere scintilla of evidence supporting the nonmoving party's theory does not create a genuine issue of material fact.  *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1175 (10th Cir. 1999).  Instead, the nonmoving party must present facts such that under the applicable law, a reasonable jury could find in its favor.  *Id.*  The Court will analyze Defendants' motions under this standard.

### Aramark's Motion

**Application of *Delgado v. Phelps Dodge* to this case--retroactivity:**   In New Mexico, a worker injured on the job is normally limited to recovering workers' compensation benefits, and may not seek a tort recovery against his employer even if the injury was caused by the employer's negligence. *Delgado v. Phelps Dodge Chino, Inc.*, 34 P.3d 1148, 52-53 (N.M. 2001).  Until the New Mexico Supreme Court decided *Delgado*, the only exception to this rule was the actual-intent

2

doctrine:  a worker could pursue tort recovery against an employer only if the employer actually intended to injure the worker.  In *Delgado*, however, the Supreme Court changed the test into one of "willfulness" and by doing so expanded the rights of employees to pursue a tort action rather than being limited to recovery of workers' compensation benefits.  *Id.*, 34 P.3d at 1156.  Aramark first contends the *Delgado* decision should not be applied to this case, because it should not be applied retroactively.

Plaintiff's injury in this case occurred on February 17, 2001, and *Delgado* was not decided until October 29, 2001.  Applying *Delgado* to the conduct in this case, therefore, would constitute retroactive application of that opinion.  *See Beavers v. Johnson Controls World Servs., Inc.*, 881 P.2d 1376 (N.M. 1994) (discussing question of applying appellate decisions to conduct occurring prior to the issuance of such decisions).  While acknowledging the existence of a presumption in favor of retroactivity, Aramark contends that presumption is overcome in this case and *Delgado* should be given only prospective application.  Aramark argues that *Delgado* establishes a new principle of law, that the history of the workers'-compensation-exclusivity rule shows that the rule's purposes will not be served by retroactive application of *Delgado*, and that such retroactive application would be inequitable.  After considering the *Beavers* opinion, however, the Court does not agree that the New Mexico Supreme Court would apply *Delgado* only prospectively.

There is no need to delve into this question in detail, because the retroactivity question in this case is almost identical to that facing the Supreme Court in *Beavers*.  In *Beavers*, the Supreme Court had to decide whether a prior opinion adopting a new tort in New Mexico, the cause of action known as "prima facie tort," should be given retroactive or only prospective effect.  The opinion adopting prima facie tort as a viable cause of action obviously increased the exposure of all types of defendants to more tort lawsuits and more causes of action.  Despite this increased exposure to lawsuits and the

resulting possibility of imposing liability on defendants for conduct that would not have been actionable prior to the adoption of prima facie tort, the Supreme Court in *Beavers* held that its prior opinion, *Schmitz v. Smentowski*, 785 P.2d 726 (N.M. 1990), should have retroactive effect.  In doing so, the Supreme Court emphasized the desirability of treating similarly-situated plaintiffs equally.  The Supreme Court also rejected the idea that a defendant might have relied on the absence of a prima-facie-tort cause of action to maliciously harm a plaintiff who previously would have had no viable cause of action against the defendant.  881 P.2d at 1383-85.

The same considerations as those discussed in *Beavers* apply in this case.  It is clearly desirable to treat similarly-situated injured workers equally.  In addition, it is unlikely that an employer would have relied on the prior workers' compensation exclusivity doctrine to act willfully, thereby harming an employee.[1]  This Court can discern no meaningful difference, for retroactivity purposes, between an opinion creating a new tort cause of action and an opinion making it somewhat easier for an employee to pursue a tort cause of action against an employer.  Therefore, the Court will find that the *Delgado* opinion should be given retroactive effect and applied to the circumstances of this case.

**Application of *Delgado* to this case--merits:**  Under *Delgado*, "willfulness renders a worker's injury non-accidental, and therefore outside the scope of the Act, when: (1) the ... employer engages in an intentional act or omission, without just cause or excuse, that is reasonably expected to result in the injury suffered by the worker; (2) the ... employer expects the intentional act or

_____

[1]The Court recognizes Aramark's argument that there was a reliance on prior law in buying workers' compensation or other insurance and the rates that were paid for that insurance. This argument was not developed factually and in any event does not concern the type of reliance the New Mexico Supreme Court considers sufficient to foreclose retroactive application of an opinion. The Supreme Court's concern is with defendants acting in reliance on prior law in their dealings with a potential plaintiff, not in purchasing insurance to cover those dealings.  *Beavers*, *supra.*

4

omission to result in the injury, or has utterly disregarded the consequences; and (3) the intentional act or omission proximately causes the injury."

The evidence supporting Plaintiff's position, that *Delgado's* exception applies to this case, is as follows: (1) the dining room in which Plaintiff was attacked was the H dining room, for medium-security rather than minimum-security prisoners, and according to Warden Lucero all the inmates in H dining room were incarcerated for violent crimes such as armed robbery, aggravated assaults, aggravated batteries, and rape [Lucero depo. pp. 34-35, Exh. B, Pltf. Resp.]; (2) Plaintiff was given no training on how to deal with inmates prior to her assignment to H dining room [Pltf. depo. p. 34, Exh. C, Pltf. Resp.]; (3) Until a few months before the attack on Plaintiff, a corrections officer had been assigned to each dining room while inmate employees were present cleaning up; but due to staffing shortages this assignment was terminated, although an officer was still present in the kitchen whenever inmates were present [Dickinson depo. pp. 41, 73, unnumbered Exh. 3, Aramark MSJ][2]; (4) Plaintiff and her fellow dining-room employees complained to Mr. Dickinson several times about the lack of security in the dining rooms [Dickinson depo. pp. 40, 67-68; Pltf. depo. pp. 32, unnumbered Exhs. 3 and 1, Aramark MSJ]; (5) Mr. Dickinson and Mr. Phan, Plaintiff's supervisors, both recognized that the lack of a corrections officer in the dining rooms was a security concern; Mr. Dickinson requested that Warden Lucero assign an officer to each dining room while inmates were present, but Warden Lucero told him she did not have sufficient staff to accommodate his request [Dickinson depo. p. 41, unnumbered Exh. 3; Phan depo. pp. 27-29, Exh. D, Pltf. Resp.]; (6) Mr. Dickinson said he was unable to put more than one employee in each dining room because of staff restrictions, even though each employee was locked into a dining room and left alone with five to

---

[2]The Court notes there was also evidence that no corrections officer had ever been assigned to the dining rooms prior to the attack on Plaintiff; however, as noted, the Court must view the evidence in the light most favorable to Plaintiff.

seven inmates [Dickinson depo. pp. 52-53, Exh. A, Pltf. Resp.]; (7) Plaintiff was told by Mr. Phan that a corrections officer was supposed to be in the dining room with her and the inmates, but there were not enough officers to go around [Pltf. depo. p. 73, unnumbered Aramark Exh. 1]; (8) Shortly before the attack on Plaintiff, she and other employees warned Dickinson that the inmate employees were not happy about cuts in their hours and their pay, and asked again for a guard to be in the dining room with them [*Id.*, pp. 28, 31-32]; (9) Two days before the attack, Plaintiff had to verbally admonish an inmate employee, Bryant, who was arguing with Plaintiff's co-worker; Plaintiff reported this incident to Dickinson [*id.*, pp. 37-39]; (10)  Although Dickinson had the power to pick up the phone and have Bryant removed from the dining room inmate-employee staff, he did not do so; instead he told Plaintiff to just deal with it, even after she told him on the day of the attack that she was uncomfortable working around Bryant  [Phan depo. p. 45; Plaintiff depo. p. 34; Dickinson depo. p. 19]; (11) After the attack, a corrections officer was stationed in H dining room when inmates were present [Lucero depo. p. 17].

This evidence would appear to be sufficient to support a conclusion the employer utterly disregarded a workplace environment expected to result in the injury suffered.  *Cf. Rivera v. Atchison, Topeka and Santa Fe Ry. Co.*, 299 P.2d 1090, 1092 (N.M. 1956) (employer negligent where aware of possible danger of attack by third parties, failed to protect employee; unlike this case, no evidence of particular danger from particular third party).  Viewing the facts in the light most favorable to Plaintiff, it could be determined that Aramark knew there was an imminent threat of grave physical danger to its employees from one particular inmate, could have prevented this danger by taking the simple step of having the threatening inmate removed from his employment in the dining

6

room, but willfully refused to take such action or do anything else to alleviate the risk of imminent harm.  This might be sufficient to allow a finding that  the *Delgado* test has been met.[3]

**Title VII claim:**  Aramark contends Plaintiff's Title VII claim should be dismissed, for two main reasons:  she was not treated differently than male employees, and she suffered no adverse employment action.     Analysis of this cause of action is difficult because this is not a typical Title VII case.  Plaintiff is not claiming she was denied a promotion or other benefits when she was not allowed to work in the kitchen, and her claimed damages are not the normal Title VII damages of the wages she would have earned had she been allowed to work in the kitchen, less the wages she earned in the dining rooms.  Instead, Plaintiff's real complaint is directed at Aramark's failure to provide adequate security for the female employees working in the dining rooms, in comparison to the male employees working in the kitchen, and the fact that she suffered physical injuries as a result.  Complicating matters is the fact that Plaintiff's injuries were inflicted by a third party, Bryant, rather than her employer.  Assuming Plaintiff has presented facts to support her position, the question in this case becomes as follows:  is Title VII violated when an employer engages in disparate treatment by

_____

[3]The Court notes Defendant's suggestion that exclusivity under the workers' compensation statute is a question of law, and that if summary judgment is denied the Court should hold a hearing, determine the necessary facts, and decide the issue.  The Court is not inclined to hold an evidentiary hearing that would duplicate evidence a jury might then be required to hear.  Furthermore, the Court has doubts about whether a judge, rather than the jury, should be finding the facts necessary to allow a determination as to the exclusivity issue.  *See Fresquez v. Southwestern Industrial Contractors and Riggers, Inc.*, 554 P.2d 986, 989 (N.M. App. 1976) (factual issue of whether certain employee was special employee, a workers' compensation doctrine, was not properly resolved on summary judgment, due to conflicting facts).  The Court will accept further argument on this question at trial, following the conclusion of Plaintiff's case.  *See K & T Enterprises, Inc. v.  Zurich Ins. Co.*, 97 F.3d 171, 174 (6th Cir. 1996) (reviewing difficult legal issues on Rule 50 motion preferable to summary judgment); *Chesapeake Paper Prods. v. Stone & Webster Eng'g Corp.*, 51 F.3d 1229, 1236 (4th Cir. 1995).

assigning women to work in a more dangerous environment than men, and a woman suffers a physical injury as a result, at the hands of a third party?

Little case law exists discussing Title VII and discriminatory assignment of one class of employee to a more hazardous position.  However, a number of courts have held or implied that a violation of Title VII would occur if minorities or women were limited to positions that were less desirable for a variety of reasons, including the dangerousness of the positions.  *See, e.g., Ewing v. Coca Cola Bottling Co. of New York, Inc.*, 2001 WL 767070 (S.D.N.Y. 2001) (plaintiffs stated a claim under Title VII by alleging that minority employees were assigned to work at menial, disgusting and dangerous jobs, while white employees were assigned to semi-skilled jobs); *Lott v. Westinghouse Savannah River Co., Inc.*, 200 F.R.D. 539, 558 (D.S.C. 2000) (minority employees alleged they were discriminatorily assigned to positions involving exposure to hazardous radiation; while denying class certification request, court appears to acknowledge that such a claim could succeed in individual cases); *Webb v. Missouri Pacific R.R. Co.*, 826 F.Supp. 1192, 1203-06 (E.D.Ark. 1993) (evidence of assignment of minority employees to lower level, dirtier, and more physically demanding jobs stated *prima facie* case of discrimination on the basis of race); *Barcume v. City of Flint*, 819 F.Supp. 631, 646 (E.D.Mich. 1993) (allegation that female officers were assigned to undesirable area of city, while males were rotated in and out of assignment, was sufficient to state Title VII claim).

Plaintiff has presented the following evidence in support of her claim that Aramark limited its women employees to the more dangerous dining room assignments:  before the attack on Plaintiff, Aramark did not allow women to work in the kitchen, ostensibly because they would not be able to "lift"; a corrections officer was always stationed in the kitchen when inmates were in the kitchen with Aramark staff, but prior to this incident no such officer was stationed in the dining rooms; Aramark knew of the danger to its women employees if they were left alone with inmates in the dining rooms;

8

while men sometimes worked in the dining rooms as well, that only occurred if a dining room employee did not show up for work; and although men were sometimes initially assigned to the dining rooms, if they showed "potential" they were moved to the kitchen.  [Phan depo. pp. 29, 37, 39, 42-43; Lucero depo. p. 13]  Based on this evidence, a reasonable fact-finder could determine that Aramark limited its female employees to work in the dining room, that this work was more dangerous for the employees than working in the kitchen with a corrections officer present, and that Aramark acted intentionally in restricting the female employees, including Plaintiff, to the more dangerous positions.  Under the case law set out above, this evidence might be sufficient to state a Title VII claim in general.

The more difficult question in this case is whether Plaintiff may recover, under Title VII, for the physical injuries and other resulting harms inflicted on her by Bryant's attack.  Plaintiff argues that the attack was an act of sexual harassment, which was severe enough to be compensable under Title VII.  Plaintiff compares this case to *Turnbull v. Topeka State Hosp.*, 255 F.3d 1238 (10th Cir. 2001), in which an employee of a hospital was sexually assaulted by a patient.  The Tenth Circuit held that the jury could find this one incident was so severe as to constitute a sexually hostile work environment.  *Id.*, 255 F.3d at 1243-44.  The Tenth Circuit also held that the employer hospital could be held liable under Title VII for the attack by the patient, if the hospital was negligent in failing to prevent such an attack.  *Id.*

There is one crucial distinction between this case and *Turnbull*, however, which prevents this case from falling into the gender-based-hostile-environment category:  a sexual assault like the one in *Turnbull* is inherently based on gender, but no evidence has been presented to the Court in this case tending to show that Bryant's physical assault on Plaintiff was gender-related.  In short, there is no evidence that Bryant punched Plaintiff because she is a woman; instead, the only evidence is that he

punched her because he was tired of taking orders from Aramark employees. [Pltf. depo. p. 42] To be actionable under Title VII, a hostile work environment must be hostile due to harassment based on gender, race, color, national origin, or religion. *See, e.g., Kopp v. Samaritan Health System, Inc.*, 13 F.3d 264, 269 (8th Cir. 1994). It is not sufficient for the environment to simply be hostile. Absent some evidence that Bryant acted out of animus because Plaintiff is a woman, his attack on Plaintiff cannot be considered an act of sexual harassment.

Outside the sexual-harassment context, the Court has been unable to find any authority for the proposition that an employer can be held liable under Title VII for the acts of a third party. Unless Plaintiff can present a viable theory of recovery for the physical harm caused by Bryant's attack on Plaintiff, the jury will not be allowed to consider the attack in the context of Plaintiff's title VII claim. Since summary judgment is being denied on that claim, however, and the issue of the attack is a matter only of the damages that might be recoverable under Title VII, the Court will not eliminate that possible issue from the case at this time.

**Intentional Infliction of Emotional Distress ("IIED")**: Aramark argues the claim for IIED must be dismissed because there is insufficient evidence of extreme or outrageous behavior by Aramark, and insufficient evidence of extreme emotional distress suffered by Plaintiff. The elements of the tort of IIED in New Mexico are extreme and outrageous conduct by the defendant, under the circumstances of the case; intentional or reckless action by the defendant; and severe emotional distress suffered by the plaintiff as a result. NMRA 13-1628, UJI for IIED. It is possible that the evidence discussed above in the workers' compensation exclusivity section, concerning Aramark's deliberate refusals to provide protection to Plaintiff in the face of direct warnings of imminent danger from a particular inmate, would allow a jury to find that Aramark's conduct was extreme and outrageous under the circumstances. Furthermore, Plaintiff's evidence that since the attack, she has

10

had problems with alcohol dependency although she never drank before the attack; that she attempted suicide once by overdosing on medication; that she is still taking medication for depression; and that she had crying spells at her new job after refusing to return to work at the prison, is sufficient to raise an issue of fact as to whether her emotional distress was severe enough to support a claim for IIED. [Pltf. depo. pp. 49-51, 53, 80-81, 102]  The Court will allow this claim to go to trial, although the Court will examine the evidence presented at trial to ensure it is sufficient to state an IIED claim that should be submitted to the jury.  Plaintiff will of course also be required to differentiate damages to prevent double recovery.  *Sabella v. Manor Care, Inc.*, 915 P.2d 901, 906 (N.M. 1996).

**Motion by Corrections Department**

The Department's motion raises only one issue, although it is not an easy one to resolve.  The Department claims that under New Mexico law, it should be considered Plaintiff's "statutory employer" and should be entitled to immunity from her tort claims, under the exclusivity provisions of the workers' compensation statute.  The Department relies on a provision of the New Mexico workers' compensation statute that states as follows, paraphrased:  an employer is considered a statutory employer of a worker, and will be treated as a direct employer of that worker for purposes of the workers' compensation statute, if:  (1)  the employer has procured any work to be done for him by a contractor other than an independent contractor; (2) the work so procured is a part or process in the trade or business or undertaking of such employer; and (3) the worker in question is employed by the entity that contracted with the employer.  NMSA § 52-1-22.  In this case, the Department argues that it procured work from Aramark by entering into a contract under which Aramark operated the food-services operation at the prison; that Aramark is not an independent contractor for purposes of Section 52-1-22; that feeding prisoners is a part or process of the Department's business of incarcerating inmates; that Plaintiff was employed by Aramark; and that the

11

Department is therefore Plaintiff's statutory employer, and entitled to immunity from Plaintiff's tort claims as a result.  There is no dispute that feeding prisoners is a crucial part of the Department's trade, business, or undertaking.  The significant issue disputed by the parties is whether Aramark should be considered an independent contractor.  If Aramark was an independent contractor, the Department does not qualify as a statutory employer and is subject to suit in tort no matter what happens to Aramark.

Plaintiff argues vigorously that the contract between the Department and Aramark explicitly states that Aramark is an independent contractor, and that this designation by the parties is controlling.  The Court disagrees.  In deciding whether a contractor like Aramark is an independent contractor for purposes of Section 52-1-22, the Court must apply the normal test for determining whether an independent contractor relationship exists.  *Harger v. Structural Servs., Inc.*,  916 P.2d 1324, 1334 (N.M. 1996).  Under that test, the fact that the parties have denominated one entity as an independent contractor, even in the contract between the parties, is not controlling in any way; instead, it is simply one factor to consider in analyzing the true relationship between the parties.  *See, e.g., id.* (whether parties believe they have created certain relationship is an "additional consideration" in deciding whether an independent-contractor relationship exists); *Whittenberg v. Graves Oil and Butane Co.*, 827 P.2d 838, 844 (N.M.App. 1991) (desires of parties are pertinent and may on occasion be dispositive as to whether or not independent-contractor relationship existed; however, those desires are not entitled to great weight when all the parties have done is agreed on a label); *see also Spirides v. Reinhardt*, 613 F.2d 826, 831 (D.C. Cir. 1979) (lower court erred in placing virtually exclusive reliance on the contract language as indicative of whether plaintiff was defendant's employee); *Hoosier Home Improvement Co. v. United States*, 350 F.2d 640, 643 (7th Cir. 1965) (contract designating workers as independent contractors is not binding as to that classification);

*Burgess v. NaCom Cable Co.*, 923 S.W.2d 450, 452 (Mo.App. 1996) (despite fact that parties' contract designated claimant as independent contractor, claimant was actually an employee for purposes of workers' compensation claim).  The Court must therefore examine all of the relevant factors to decide whether summary judgment is appropriate on this issue.

According to *Harger*, the following matters must be considered in deciding whether a contractor is an independent contractor:  (1) direct evidence of the exercise of control; (2) the right to terminate the employment relationship at will, by either party, without liability; (3) the right to delegate the work or to hire and fire assistants; (4) the method of payment, whether by time or by the job; (5) whether the party employed engages in a distinct occupation or business; (6) whether the work is a part of the employer's regular business; (7) the skill required in the particular occupation; (8) whether the employer supplies the instrumentalities, tools, or the place of work; (9) the duration of the person's employment, and the hours worked; and (10) whether the parties believe they have created the relationship of employer and employee, insofar as this belief indicates an assumption of control by one and submission to control by the other.  916 P.2d at 1334.  No particular factor should receive greater weight than any other, and the presence or absence of a particular factor should not be decisive.  Instead, the totality of the circumstances must be considered in deciding whether the employer has the right to exercise essential control over the work or workers of a particular contractor.  *Id.*  In addition the reviewing the *Harger* factors, the Court has also looked to other cases discussing the issue, for guidance as to other significant considerations.  Some that appear to be applicable to this case are the duration of the relationship between the parties, whether the hiring party has the right to assign additional projects to the hired party, and whether the hired party bears the risk of earning a profit or suffering a loss from the parties' transaction.  *See Community for*

13

*Creative Non-Violence v. Reid*, 490 U.S. 730, 751-52 (1989); *Ware v. United States*, 67 F.3d 574, 578-79 (6th Cir. 1995).

Some of the above factors are more relevant to a situation involving an individual contracting with a business, rather than one company contracting with another entity as is the case here.  Of the factors relevant to the inquiry in this case, under the facts submitted to the Court some favor a finding of independent-contractor status for Aramark, and others do not.  For example, the contract does state that Aramark is to be considered an independent contractor, as noted above; while that characterization is not dispositive, it must be taken into account.  [Aramark/Dep't Contract, Para. 9, Exh. A, Pltf. Resp. to Dep't MSJ]  Also, the contract was not terminable at will; instead, either party could terminate the contract but only upon written notice at least thirty days in advance of the termination.  [N.M. Purch. Div. Contract, Article III, Exh. A, MSJ]  Aramark is an international company, engaged in the business of providing food service operations to, *inter alia*,  schools, colleges, health care facilities, and correctional institutions.  Under the purchasing division contract, Aramark was required to furnish all equipment, material, labor, and tools necessary to perform the specified work.  [Article VII(A), *id.*]  In addition, Aramark was required to provide the employees, pay them, provide their benefits, and schedule their hours.  [Aramark/Dep't Contract, par. 1(d), Exh. A, p. CD0055, Pltf. Resp. to MSJ]  Significantly, Aramark bore the risk of profit or loss, rather than simply being a conduit for wages paid to its employees.  Also, the duration of the relationship between the parties was limited by contract, and the Department could not assign additional responsibilities to Aramark other than those contained in the contract.  Finally, Aramark had its own administrative structure and had supervisors (Dickinson and Phan) on site to control the work its employees performed.

14

On the other hand, there is also evidence that the Department had extensive contractual rights that would support a finding that Aramark was not an independent contractor.  For example, the Department had the right to exert significant control over some aspects of Aramark's relationships with its employees.  The Department in effect had veto power over which employees Aramark could assign to the prison, because changes in Aramark personnel at the prison had to be approved in writing by the Department and the Department could exclude any employee from the prison for security reasons.  [Aramark/Dep't contract, par. 1(f), 17, Exh. A, MSJ]  Furthermore, the Department required Aramark to provide minimum staffing levels at the prison and specified the minimum number of employees required to meet those levels.  [RFP, p. 19, Exh. A, MSJ, p. CD0026] In addition, the Department controlled, in excruciating detail, the product to be supplied by Aramark--the Department specified, as just a few examples, the minimum number of calories per day to be provided to the inmates, the types of meals to be served on holidays, the types of foods to be served for breakfast, lunch, and dinner, the percentages of protein, fat, and carbohydrates to be contained in the daily menus, and the maximum amounts of sodium  and cholesterol per day that could be served.  [Aramark/Dep't contract, par. 13, Exh. A, pp. CD0062-65]  The Department had the right to approve the menus proposed by Aramark in advance, and required a five-week cycle of menus offering a variety of meals.  [*Id.*]  The Department, of course, provided the workplace, since the meals were prepared and served inside the prison.  The Department required Aramark employees to obtain security clearances before they could work at the prison, and required Aramark employees to comply with the Department's policies and procedures.  [*Id.*, par. 1(e) and 1(f), p. CD0055]  In sum,

15

there is evidence that the Department had more control over Aramark's finished operations, employees, and finished product than might be the case in the usual independent contractor situation.[4]

Examining the totality of the circumstances, the Court cannot grant the Department's motion for summary judgment.  As is apparent from the above discussion, there is too much evidence on both sides of the issue to allow a decision to be made as a matter of law.  Furthermore, the New Mexico Supreme Court has stated that the actual degree of control exercised by the hiring party, as opposed to the right of control granted by the contract, could be a highly relevant consideration.  *Harger*, 916 P.2d at 1333-34, n. 3.  Little evidence concerning the actual, on-the-ground extent of such control has been submitted to the Court.  The motion for summary judgment will therefore be denied.  The Court will await the parties' input as to whether, like the *Delgado* issue, this statutory-employer question is one that should be submitted to the jury or decided by the Court, or decided in a hybrid fashion based on special interrogatories to the jury.

**Conclusion**

Based on the foregoing, the motions for summary judgment filed by Aramark and the Department will both be denied.

**ORDER**

A Memorandum Opinion having been entered in this case, it is hereby ORDERED  that the motions for summary judgment filed by Defendant Aramark Correctional Services, Inc. and Defendant New Mexico Corrections Department (Docs. 45, 42) be, and hereby are, DENIED.

---

[4]The Department argues that its extensive right to control the menus and meals is controlling of the independent-contractor issue.  However, the right to control the results produced by the contractor, even in detail, is not dispositive or even the most important consideration.  *See Reid*, 490 U.S. at 752.  It is the control over the means by which those results are reached which is more significant.

Dated February 24, 2004.


BRUCE D. BLACK
United States District Judge


**Attorneys:**

**For Plaintiff:**
Merit Bennett
Jennifer Janulewicz
Stephen Tinkler

**For Defendant Aramark**
Theresa W. Parrish
Deborah S. Gille

**For Defendant Corrections Department**
John M. Wells